UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DEAVEN E. TUCKER,                          :
                    Plaintiff,             :
                                           :
          v.                               :      CA 07-406 ML
                                           :
ASHBEL T. WALL, et al.,                    :
                    Defendants.            :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

     Before the Court is the Motion for Summary Judgment (Docket
("Dkt.") #84) ("Motion for Summary Judgment" or "Motion") filed by
Defendants Jake Gadsden ("Gadsden"), Lieutenant Alves ("Alves"),
and Correctional Officer Melino ("Melino").[1]  The Motion has been
referred to me for preliminary review, findings, and recommended
disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The Court has
determined that no hearing is necessary.  For the reasons stated
below, I recommend that the Motion be denied.

**I.  Clarification as to Movants and Claims**

     Although the Motion purports to be filed by Gadsden, Alves,

_____

     [1] In point of fact, the only remaining Defendants in this action are
Jake Gadsden ("Gadsden") and Correctional Officer Melino ("Melino").  See
Memorandum and Order (Docket ("Dkt.") #60) ("M&O").  Although the M&O
denied Defendants' Motion to Dismiss (Dkt. #22) with respect to the First
and Fourteenth Amendment claims against Defendants Melino, Alves, and
Ashton alleging retaliation, see M&O ¶ 4, the same M&O dismissed Alves
and Ashton from the action pursuant to Fed. R. Civ. P. 4(m), see id. ¶
7.

and Melino, see Motion, Alves was dismissed from this action on January 27, 2010, pursuant to Fed. R. Civ. P. 4(m), see Memorandum and Order (Dkt. #60) ("M&O") ¶ 7. Accordingly, the Court treats the Motion as being filed only by Gadsden and Melino and refers to them collectively as "Defendants."

The Motion seeks summary judgment on the remaining claims of Plaintiff Deaven E. Tucker ("Plaintiff" or "Tucker"). Those claims are Plaintiff's Fourteenth Amendment claims against Gadsden regarding conditions of Plaintiff's confinement as a pretrial detainee, see M&O ¶ 4a, and his First and Fourteenth Amendment claims against Melino regarding retaliation for Plaintiff's legal filings, see M&O ¶¶ 4b and 7. **II. Facts**

**A. Allegations Against Gadsden**

In May 2007, Plaintiff was serving a sentence in maximum security segregation at the Adult Correctional Institutions ("A.C.I.") in Cranston, Rhode Island. See Complaint at 9.[2] He had been moved to that facility from "high security B status," id., on May 3, 2007. Id. Gadsden was the Assistant Director of Institutions and Operations for the Rhode Island Department of Corrections ("D.O.C") and responsible for overseeing the overall operations of all of the secured facilities operated by the D.O.C. Defendants' Statement of Undisputed Facts ("SUF") ¶¶ 1-2.

---

[2] "Complaint" refers to the thirteen page document entitled "Civil Rights Complaint" which was received by the Court on November 1, 2007, as an attachment to the Court's standard *pro se* complaint form (Dkt. #1).

Plaintiff's sentence ended on June 4, 2007,[3] Complaint at 9, but he was recommitted to the ACI on June 6, 2007, pursuant to a pending charge of first degree murder, SUF ¶ 4.

Plaintiff alleges that upon completion of his sentence he should have been moved to the intake service center as a nonsentenced, awaiting trial inmate. Complaint at 9. He submitted "request slips," id., regarding his status, and on June 15, 2007, Warden James Weeden came to see him. Warden Weeden gave Plaintiff a memorandum and explained that he was on a new status called "administrative confinement awaiting trial" ("ACAT"). Id. The memorandum stated in part:

> Your current status is "Administrative Confinement Awaiting Trial." You have been placed on this status for security reasons. You are allowed one (1) visit per week, store orders, daily exercise excluding weekends and holidays, mail, radio with head phones; along with access to health care, telephone, legal and reading material.
>
> Your institutional behavior has been good and I encourage you to continue. You will be given what you are entitled to while you are on this status.

Motion, Attachment ("Att.") 4 (Memorandum from Weeden to Tucker of 6/15/07).[4] Plaintiff alleges that Weeden told him that this status

---

[3] An August 30, 2007, memorandum from Warden James Weeden to Tucker states that his "sentence expired on 6/6/07 ...." Motion, Att. 5 (Memorandum from Weeden to Tucker of 8/30/07). This two day difference in the date Plaintiff's sentence expired does not affect the Court's resolution of the Motion.

[4] Defendants' Statement of Undisputed Facts (Dkt. #85) ("SUF") refers to the Memorandum from Weeden to Tucker of 6/15/07 as "Exhibit A." SUF ¶ 8. There are no exhibits appended to the SUF, but it is clear that the document being referenced is the memorandum filed with the Motion as Att 4.

had been created on December 15, 2006, with Plaintiff "solely in mind." Complaint at 9.

According to Plaintiff, he does not fit the criteria for ACAT, and Gadsden[5] did not follow prescribed procedure in placing and keeping Tucker in this status. Id. at 9-10. In particular, Tucker claims that he has never spoken with an Administrative Confinement Review ("ACR") panel or a mental health professional,[6] id. at 10, never had outside recreation, id., and has not received telephone and other privileges to the extent allowed by the policy governing ACAT, see id.

According to Defendants, upon Plaintiff's recommitment, Gadsden conferred with Chief Investigator Robert Catlow ("Catlow") of the Special Investigation Unit and with Warden Weeden concerning Plaintiff's housing placement. SUF ¶ 5. Plaintiff was considered by Gadsden, Catlow, and Weeden to be a high profile and very

---

[5] In his Complaint, Plaintiff alleges that "they didn't follow the policy & procedure [for ACAT]." Complaint at 10. The Court narrows the plural "they" to Gadsden because he is the only defendant remaining in this action to whom this allegation could apply. Cf. Report and Recommendation (Dkt. #54) at 11 (noting that "the Complaint states that defendant Gads[d]en is responsible for Plaintiff's classification and where he is housed at the ACI").

[6] Plaintiff states that he has "never spoken to ... a psychologist as is policy." Complaint at 10. Reading Plaintiff's pro se pleading generously, the Court has substituted "mental health professional" above for "psychologist" as the former term appears to match the terminology used in the Rhode Island Department of Corrections' written policy for ACAT. See Plaintiff's Motion in Opposition to Defendants['] Request for Summary Judgment Pursuant [to] F.R.C.P. Rule 56(f) to Allow Adequate Time for Discovery Material (Dkt. #95), Att. (August 26, 2010, Affidavit of Deaven E. Tucker, Sr. ("8/26/10 Tucker Aff.")), Exhibit ("Ex.") A (ACAT Policy) ¶ E.3.b.

influential inmate who had numerous enemies at the High Security and Intake Service Centers. SUF ¶ 6. There were several detainees housed at the Intake and High Security Centers that were slated to testify against Plaintiff. Id. Gadsden considered Plaintiff to have enough influence among the detainee/inmate population to be able to arrange attacks on his enemies and those who were expected to testify against him. Id. Because of these concerns, Gadsden ordered that Plaintiff be housed on ACAT status at Maximum Security for the protection of the inmate population and for the overall security of the various prison facilities. SUF ¶ 7.

Gadsden swears in an affidavit that Plaintiff, as a detainee on ACAT status housed in Maximum Security, enjoyed all the entitlements he would have been provided had he been housed at the Intake Service Center "on said status ...," Motion, Att. 3 (Affidavit of Jake Gadsden ("Gadsden Aff.")) ¶ 6,[7] and that these included "phone calls, visits, daily exercise, store orders, mail, radio with headphones, health care, telephone, legal and reading materials," id. Defendants have also submitted an August 30, 2007, memorandum from Warden Weeden to Tucker responding to Tucker's letter to Gadsden of July 16, 2007.[8] In the memorandum, Warden

---

[7] The Affidavit of Jake Gadsden ("Gadsden Aff.") has two paragraphs numbered "6." The Court cites here to the second of these paragraphs.

[8] Plaintiff's letter to Gadsden of July 16, 2007, is not part of the present record, but its content can be inferred from Weeden's August 30, 2007, memorandum which is Att. 5 to the Motion.

Weeden states that he "will insure that someone from Mental Health Services comes to see you." Id.

## B. Allegations Against Melino

Plaintiff alleges that on July 24, 2007, he filed a lawsuit pursuant to 42 U.S.C. § 1983. See Complaint at 10. He further alleges that two days later, on July 26th, Lieutenant Alves and Melino, along with two other correctional officers and a captain, came to his cell to search it. See id. According to Plaintiff, they berated him for filing grievances and the § 1983 lawsuit. Id. He was informed that his "law suit was opened, read & trashed." Id. at 11. Melino then searched Plaintiff's cell. Id. During the search Lieutenant Alves and one of the other correctional officers turned their backs. Id. Plaintiff observed Melino pull out a 12" piece of steel from his waistband and heard him tell Lieutenant Alves that it had been in Plaintiff's cell vent. Id. Plaintiff was "booked for a weapon," id., and placed in segregation, id.

## III. Travel[9]

Plaintiff filed his Complaint on November 1, 2007, against multiple defendants. As previously noted, the only remaining

_____

[9] The Court recounts only the travel pertaining to the Motion for Summary Judgment and Plaintiff's responses to that Motion. Accordingly, except where necessary to give context to orders relating to the Motion, discussion of Plaintiff's multiple (and sometimes duplicative) motions to compel discovery and to appoint counsel (and of the orders addressing those motions) is omitted. See Dkt.; see also Order Denying Plaintiff's Motion to Set Aside Summary Judgment Ruling (Dkt. #125) at 2 n.2 (ordering Plaintiff to cease "practice of re-filing photocopies of previous motions (and/or memoranda) bearing new signatures and/or dates").

defendants are Gadsden and Melino.

Defendants filed their Motion for Summary Judgment on August 4, 2010. See Dkt. Plaintiff filed an opposition to the Motion on August 16, 2010. See Plaintiff['']s Motion in Opposition to Defendants['] Request for Summary Judgment Pursuant [to] F.R.C.P. Rule 56(f) to Allow Adequate Time for Discovery Material (Dkt. #87) ("First Opposition").[10] Ten days later, on August 26th, he filed a Motion Request for Extension of Time (Dkt. #89) ("First Request for Extension") and a Motion to Set Aside Summary Judgment Ruling until Adequate Time for Discovery has been Allowed (Dkt. #90) ("Motion for Continuance"). On September 1, 2010, he filed another motion seeking the same relief. See Motion to Set Aside Summary Judgment Ruling until Adequate Time for Discovery has been Allowed (Dkt. #93) ("Second Motion for Continuance"). On the same date, Plaintiff filed his second opposition to the Motion. See Plaintiff's Motion in Opposition to Defendants['] Request for Summary Judgment Pursuant [to] F.R.C.P. Rule 56(f) to Allow Adequate Time for Discovery Material (Dkt. #95) ("Second Opposition"). In addition, Plaintiff sent a letter to Chief Judge Lisi in which he requested assistance in obtaining declarations from three inmates at the ACI. See Letter from Tucker to Lisi, C.J., of 8/27/10 (Dkt. #96). The letter was treated as a motion to

---

[10] Plaintiff uses nonstandard capitalization. For clarity, the Court has capitalized some lowercase letters in the titles of Plaintiff's filings.

depose three prisoner-witnesses by written questions.  <u>See</u> Memorandum and Order (Dkt. #104) at 1 (treating the letter as such).

On November 16, 2010, Senior Magistrate Judge Jacob Hagopian granted Plaintiff's Motion for Continuance (Dkt. #90), and denied the First Request for Extension (Dkt. #89) because it was not supported by the required Rule 56(f) affidavit. <u>See</u> Memorandum and Order (Dkt. #103) at 3.  Judge Hagopian also denied the Second Motion for Continuance (Dkt. #93) as duplicative. <u>See</u> <u>id.</u>  On November 23, 2010, Judge Hagopian issued another memorandum and order in which he granted Plaintiff's motion for leave to take written depositions (Dkt. #96) of the three inmates.  <u>See</u> Memorandum and Order (Dkt. #104).

On December 14, 2010, Plaintiff filed a Motion Request for Extension of Time (Dkt. #105), seeking additional time to respond to the Motion for Summary Judgment because he had been transferred by D.O.C. to Connecticut.  <u>See</u> Memorandum of Law in Support of Plaintiff['']s Motion for Extension of Time at 1-2.  The same day the Court issued a text order granting Plaintiff's request for additional time and giving him until March 31, 2011, to complete discovery and file a response to Defendants' Motion for Summary Judgment.  <u>See</u> Dkt.

On January 25, 2011, Plaintiff filed another Motion to Set Aside Summary Judgment Ruling until Adequate Time for Discovery has

been Allowed (Dkt. #108) and a Memorandum of Law in Support of Plaintiff's Motion for Extension of Time (Dkt. #110). The Court treated the latter filing as a motion for extension of time and denied it because it was identical to the "Memorandum of Law in Support of Plaintiff's Motion for Extension of Time" (Dkt. #94) which Plaintiff had filed on September 1, 2010, in support of his Motion Request for Extension of Time (Dkt. #89). See Order Denying Plaintiff's Motion for Extension of Time (Dkt. #113). In denying the request, the Court noted that Plaintiff's Motion for an Extension of Time (Dkt. #105) had been granted and that Plaintiff had until March 31, 2011, to complete discovery and to file a response to Defendants' Motion for Summary Judgment. See Order (Dkt. #113) at 2 n.2.

Plaintiff filed another Motion to Stay Proceedings (Dkt. #119) on March 14, 2011. The Court denied this motion in a four page order issued on April 6, 2011, which in part stated:

> 1. To the extent that the Motion is based on the grounds that Plaintiff is in the custody of the Connecticut Department of Corrections, that he allegedly does not have access to a law library or to an inmate law clerk, and that Defendants have allegedly failed to comply with discovery, the Motion is denied because, even accepting these grounds, Plaintiff has failed to explain how the allegedly outstanding discovery, if provided, would influence the outcome of the pending Motion for Summary Judgment. Plaintiff's conclusory assertions that certain documents which Defendants have allegedly failed to

provide are "crucial," Motion Letter[11] at 2, or that
"declarations from inmate witnesses [] would prove
plaintiff['s] case," id., are insufficient as they do not
explain why the documents are "crucial" and what the
declarants are expected to say.[]

...

3. As stated in the Order of 3/15/11, the Court has
reviewed the Motion for Summary Judgment, Defendants'
Statement of Undisputed Facts (Dkt. #85), the January 6,
2010, Report and Recommendation of Senior Magistrate
Judge Jacob Hagopian (Dkt. #54), and Plaintiff's
Affidavit of 12/28/10. After doing so, the Court is not
persuaded that Plaintiff needs additional time to respond
to the Motion for Summary Judgment.

Order Denying Motion to Stay Proceedings (Dkt. #129) at 2-4.

In the meantime, on March 15, 2011, the Court denied
Plaintiff's Motion to Set Aside Summary Judgment Ruling until
Adequate Time for Discovery has been Allowed (Dkt. #108). See
Order Denying Plaintiff's Motion to Set Aside Summary Judgment
Ruling (Dkt. #125). The Court stated that the motion and the
second attachment to the motion were "essentially identical to
documents which Plaintiff has previously filed in this action and
which the Court ha[d] already considered and/or denied."[12] Id. at

---

[11] "Motion Letter" refers to the memorandum which Plaintiff filed
with the Motion to Stay Proceeding (Dkt. #119). See Order Denying Motion
to Stay Proceedings (Dkt. #129) at 1 n.1 (explaining "Motion Letter").

[12] In a footnote appearing at this point in the Order, the Court
stated that the motion (Dkt. #108):

is essentially identical to the Motion to Set Aside Summary
Judgment Ruling until Adequate Time for Discovery Has Been
Allowed (Dkt. #93) which was denied by the Memorandum and
Order of 11/16/10 (Dkt. #103). Similarly, the second
attachment to the [m]otion (Affidavit from Plaintiff dated
"December 28th 2010" ("Aff. of 12/28/10") differs from the

2.

The Motion for Summary Judgment was referred to this Magistrate Judge on June 8, 2011. Thereafter, it was taken under advisement.

## IV. Summary Judgment Standard

"Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed. R. Civ. P. 56(c)); accord Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d

---

Affidavit attached to Dkt. #93 only in the fact that Plaintiff has re-signed the affidavit and had his signature notarized.
Plaintiff's practice of re-filing photocopies of previous motions (and/or memoranda) bearing new signatures and/or dates, see Order Denying Plaintiff's Motion for Extension of Time (Dkt. #113) at 1 (denying motion for extension of time "because it is identical to the 'Memorandum of Law in Support of Plaintiff's Motion for Extension of Time' (Dkt. #94)"), is problematic and creates confusion in the record.

Order Denying Plaintiff's Motion to Set Aside Summary Judgment Ruling (Dkt. #125) at 2 n.2.

46, 52 (1st Cir. 2000)(quoting <u>Sánchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000)(citing <u>Mulero-Rodríguez v. Ponte, Inc.</u>, 98 F.3d 670, 672 (1st Cir. 1996)). The non-moving party may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. <u>See Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d at 53 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002)(quoting <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 842 (1st Cir. 1993))(alteration in original)(internal quotation marks omitted).

"[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." <u>Coyne v. Taber</u>

<u>Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." <u>Gannon v. Narragansett Elec. Co.</u>, 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

## V.   Discussion

### A.   Law Applicable to Pre-Trial Detainees

The Court of Appeals for the First Circuit has stated that:

The government may detain one accused of a crime prior to trial in order to ensure his presence at trial. Prior to an adjudication of guilt, however, a state government may not punish a pretrial detainee without contravening the Fourteenth Amendment's Due Process Clause. The government may, however, impose administrative restrictions and conditions upon a pretrial detainee that effectuate his detention and that maintain security and order in the detention facility. **When confronted with a charge by a pretrial detainee alleging punishment without due process, the "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."**

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate government[al] objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless–a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees

qua detainees.

O'Connor v. Huard, 117 F.3d 12, 16 (1ˢᵗ Cir. 1997)(quoting Bell v. Wolfish, 411 U.S. 520, 538-39, 99 S.Ct. 1861 (1979))(internal citations omitted)(bold added); see also Bell v. Wolfish, 441 U.S. at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.")(footnotes omitted); id. at 536-37 ("[T]he Government concededly may detain [a person lawfully committed to pretrial detention] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."); Surprenant v. Rivas, 424 F.3d 5, 13 (1ˢᵗ Cir. 2005)("While a pretrial detainee may be disciplined for a specific institutional infraction committed during the period of his detention, the discipline imposed must be roughly proportionate to the gravity of the infraction. An arbitrary, or disproportionate sanction, or one that furthers no legitimate penological objective, constitutes punishment (and, thus, is proscribed by the Fourteenth Amendment).")(internal citations omitted). However,

the Government must be able to take steps to maintain
security and order at the institution .... Restraints
that are reasonably related to the institution's interest
in maintaining jail security do not, without more,
constitute unconstitutional punishment, even if they are
discomforting and are restrictions that the detainee
would not have experienced had he been released while
awaiting trial.

Bell v. Wolfish, 441 U.S. at 540. Moreover,

[i]n determining whether restrictions or conditions are
reasonably related to the Government's interest in
maintaining security and order and operating the
institution in a manageable fashion, courts must heed our
warning that [s]uch considerations are peculiarly within
the province and professional expertise of corrections
officials, and, in the absence of substantial evidence in
the record to indicate that the officials have
exaggerated their response to these considerations,
courts should ordinarily defer to their expert judgment
in such matters.

Id. at 540 n.23 (second alteration in original)(internal quotation

marks omitted).

The Bell v. Wolfish court stated that it had "recognized a

distinction between punitive measures that may not constitutionally

be imposed prior to a determination of guilt and regulatory

restraints that may." 441 U.S. at 537. The court described the

tests traditionally applied to determine whether a governmental act

is punitive in nature:

"Whether the sanction involves an affirmative disability
or restraint, whether it has historically been regarded as a
punishment, whether it comes into play only on a finding of
scienter, whether its operation will promote the traditional aims
of punishment-retribution and deterrence, whether the behavior to
which it applies is already a crime, whether an alternative purpose
to which it may rationally be connected is assignable for it, and
whether it appears excessive in relation to the alternative purpose
assigned are all relevant to the inquiry, and may often point in

15

differing directions."

Id. at 537-38 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554 (1963))(footnotes omitted).

**B. Claims Against Gadsden**

Defendants have advanced a legitimate governmental purpose for placing Plaintiff on ACAT status in Maximum Security, namely that the placement was necessary to address security concerns based on the following facts: (1) Plaintiff had numerous enemies at the High Security and Intake Service Centers; (2) inmates housed at both facilities were slated to testify against him; and (3) he was believed to possess the ability to influence other inmates to perpetrate attacks on those inmates who were expected to testify against him. Gadsden Aff. ¶¶ 4-5. Plaintiff has offered nothing which contradicts these facts.

There is, however, a factual dispute as to the particular conditions to which Plaintiff was subjected while held in ACAT. Although Gadsden swears that Plaintiff received all of the entitlements he would have been provided had he been housed on ACAT status at the Intake Service Center, including phone calls, visits, daily exercise, store orders, mail, radio with headphones, health care, legal and reading materials, see Gadsden Aff. ¶ 6, Plaintiff disputes this, see December 28, 2010, Affidavit of Deaven B.

Tucker, Sr. ("12/28/10 Tucker Aff.")[13] ¶ 2 (swearing that he "was placed in maximum security seg unit back on May 3rd 2007 & held there until September 14th 2007, without access to outside rec, legal materials, contact visits, radio & commissary privileges"[14]). Thus, for purposes of the instant Motion, the Court must assume that from June 4, 2007,[15] to September 14, 2007, or approximately 100 days, Plaintiff was not allowed any outside recreation, access to legal materials, contact visits, radio and commissary privileges. Defendants have not disputed Plaintiff's allegations that they did not follow some provisions of the written policy governing ACAT. <u>See</u> Complaint at 10. Specifically, Defendants have not disputed Plaintiff's claims that he "never spoke[] to an ARC[16] panel or a psychologist ...." <u>Id.</u>

_____Regarding the former claim, it is true that ACAT policy does

---

[13] The December 28, 2010, Affidavit of Deaven E. Tucker, Sr. ("12/28/10 Tucker Aff.") is an attachment to Plaintiffs' motion to set aside summary judgment (Dkt. #108).

[14] The Court interprets "commissary privileges" to refer to store orders.

[15] Plaintiff states that he "was placed in maximum security seg unit back on May 3rd 2007 & held there until September 14th 2007 ...." 12/28/10 Tucker Aff. ¶ 2. However, because Plaintiff only became a pretrial detainee when his sentence expired on June 4, 2007, <u>see</u> Complaint at 9, the relevant period for purposes of Plaintiff's claim against Gadsden is June 4, 2007, to September 14, 2007, <u>see</u> 12/28/10 Tucker Aff. ¶ 2.

[16] The copy of the ACAT policy which Plaintiff has attached as an exhibit to his August 26, 2010, affidavit identifies this panel as the "Administrative Confinement Review ("ARC") panel." Second Opposition, Att. 2 (ACAT Policy) at 3. The policy refers to this body as both the "ARC," <u>id.</u>, and the "ACR." <u>id.</u> at 7. (Because the pages of Att. 2 are not in order, the Court cites to the CM/ECF page numbers which appear in the upper right hand corner of the document.)

not explicitly state that a detainee will appear before the ARC panel. However, the policy does refer to "ARC Panel meetings," Second Opposition, Att. 2 at 3, and to the ARC panel conducting "review[s]," id., of the detainee's status, see id. Given the state of the law at the time, it can be reasonably inferred from this that the policy contemplates that the detainee will appear before the ARC panel. See Benjamin v. Fraser, 264 F.3d 175, 188 (2nd Cir. 2001)(finding no error in district court's order that pretrial detainees subject to additional restraints are entitled to "a reasonably prompt hearing and periodic review"); see also Ford v. Clarke, 746 F.Supp.2d 273, 297 (D. Mass. 2010)(noting that in 2007 "it was clearly established that, as a result of their status, pretrial detainees are entitled to a hearing or some form of procedural protection before they can be housed in disciplinary confinement"). Even if the ACAT policy does not require a personal appearance by the detainee before the ARC panel, Plaintiff's Complaint, as clarified by his December 28, 2010, affidavit, is reasonably understood to allege that he was held in ACAT for 100 or more days and that his status was not reviewed during that time by the ARC panel. Relevant to this claim, the Court notes that the ACAT policy refers to "[m]inutes for ... ARC Panel meetings," Second Opposition, Att. 2 at 3, and Defendants have not supported their Motion with any evidence that Plaintiff's status was reviewed by the ARC after his initial meeting with Warden Weeden on June 15,

18

2007.  In fact, Warden Weeden's August 30, 2007, memorandum to Plaintiff states flatly that he "will remain on this status until further notice, pending Assistant Director Gadsden's review." Motion, Att. 5.  The absence of any reference to the ARC panel in the memorandum lends some support to Plaintiff's claim that Defendants did not follow ACAT procedures.

Regarding Plaintiff's claim that he did not see a psychologist during the period at issue, while Warden Weeden's August 30th memorandum states that he "will insure that someone from Mental Health Services comes to see you," id., there is no evidence that anyone from Mental Health Services in fact saw Plaintiff as required by ACAT policy, see Second Opposition, Att. 2 at 3 ("If a detainee remains in Administrative Confinement for more than thirty (30) days, a mental health professional makes a mental health assessment (including progress notes in the medical record) at least every thirty (30) days thereafter or more often as clinically indicated.").

Of course, the issue here is not whether Gadsden followed ACAT procedures, but whether Plaintiff was held in ACAT status "for the purpose of punishment," O'Connor v. Huard, 117 F.3d at 16, or for "some other legitimate governmental purpose," id. (quoting Bell v. Wolfish, 441 U.S. at 538).  Although it is a close question, the following facts tip the scales in Plaintiffs's favor.  With respect to the "particular condition or restriction," id. (quoting Bell v.

<u>Wolfish</u>, 441 U.S. at 539), of no outdoor exercise or recreation for a period of 100 or more days, Gadsden has offered no evidence that this restriction "is reasonably related to a legitimate government[al] objective," <u>O'Connor</u>, 117 F.3d at 16 (quoting <u>Bell v. Wolfish</u>, 411 U.S. at 539). Although Gadsden has articulated that security concerns prompted him to place Plaintiff on ACAT status, he has not explained why these concerns made it necessary to deprive Plaintiff of outdoor exercise or recreation for such an extended period. In other words, Gadsden has not provided any evidence that denying Plaintiff outdoor exercise or recreation for 100 or more days was "reasonably related to a legitimate government[al] objective." <u>Id.</u>

The length of the deprivation here is more than minimal, and it is a key factor in the Court's conclusion that the Motion should be denied with respect to Gadsden. <u>See</u> <u>Jamison-Bey v. Thieret</u>, 867 F.2d 1046, 1046-47 (7th Cir. 1989)(reversing magistrate judge's grant of summary judgment in favor of warden where inmate was confined in segregation for 101 days and not allowed use of exercise yard); <u>see also</u> <u>Graves v. Arpaio</u>, 633 F.Supp.2d 834, 848 (D. Ariz. 2009)(noting district court's finding that jail recreation yards did not provide sufficient space to satisfy "pretrial detainees' constitutional right to outdoor exercise one hour per day, four days per week"); <u>Carty v. Turnbull</u>, 144 F.Supp.2d 395, 409 (D.V.I. 2001)(noting that court ordered

defendants to provide pretrial detainees and inmates with "two hours of recreation, five days a week"); <u>Toussaint v. Rushen</u>, 553 F.Supp. 1365, 1385 (N.D. Cal. 1983)(granting preliminary injunction in case challenging conditions of administrative segregation and ordering that "each prisoner shall be provided with outdoor exercise" at least one hour every day or two hours every other day for a minimum total of eight hours a week or at least three times a week for a minimum total of ten hours a week unless precluded by temporary and compelling exigencies); <u>cf.</u> <u>Cox v. Malone</u>, 199 F.Supp.2d 135, 142 (S.D.N.Y. 2002)(noting that inmates in disciplinary segregation and administrative and detention segregation were all "allowed one hour of outdoor exercise daily"); <u>United States v. County of Crittenden, State of Arkansas</u>, Civ. A. No. JC89-141, 1990 WL 257949, at *14-15 (E.D. Ark. Dec. 26, 1990) (requiring that "[r]easonable opportunities for outdoor large muscle activities ... be provided to inmates on a regular basis" and stating that "[i]f all inmates cannot be permitted five hours per week of outdoor exercise due to ongoing security concerns, then preference shall be afforded to those inmates who have resided at [the county jail] for periods in excess of fourteen (14) days"); <u>Rhem v. Malcolm</u>, 432 F.Supp. 769, 784 (S.D.N.Y. 1977)(noting that the "Nebraska [State Bar Association, Proposed] Standards [for Local Criminal Detention Facilities] prescribe that as a 'minimum' every inmate over 16 years of age have one hour per day of outdoor

exercise and recreation").

The Court is also influenced by the fact that Gadsden's statement that Plaintiff "enjoyed ... daily exercise," Gadsden Aff. ¶ 6, is at least partially at odds with Warden Weeden's June 15, 2007, memorandum which states that Plaintiff is allowed "daily exercise excluding weekends and holidays," Motion, Att. 4. The qualification "excluding weekends and holidays" is a significant difference, especially in light of the fact that there were three holidays within the time span at issue (July 4th, Victory Day,[17] and Labor Day). The last two of these holidays fell on Mondays, meaning that on two occasions Plaintiff would not have been allowed any exercise for three consecutive days.

Lastly, as already noted, there is a factual dispute as to whether Plaintiff had commissary privileges and access to legal materials and radio. While these matters by themselves might not be sufficient to cause this Magistrate Judge to recommend against granting the Motion, when added to the disagreement in the record as to the frequency with which Plaintiff was afforded exercise and Plaintiff's claim of no outdoor exercise for the entire period, I am unable to find that the conditions or restrictions of which Plaintiff complains were not imposed "for the purpose of punishment," O'Connor, 117 F.3d at 16, and were instead for "some

---

[17] Victory Day is a Rhode Island state holiday marking the end of World War II and is celebrated on the second Monday in August.

other legitimate governmental purpose," id. Accordingly, I recommend that the Motion be denied as to Defendant Gadsden.

### C. Claims Against Melino

With respect to Melino, resolution of the Motion is a simpler task. As Defendants seemingly recognize, there is a factual dispute as to what Melino did during the search of Plaintiff's cell. See Memorandum at 3[18] ("Although plaintiff asserts that Melino planted the weapon in the presence of [Captain] Ashton and [Lieutenant] Alves, the defendants tell a very different story."); id. at 4 ("[T]he only evidence proffered by plaintiff in support of his retaliation claim[] consists of his own testimony about Melino planting the weapon in the presence of Alves and Ashton. Defendants directly contradict said testimony ....").

A claim alleging retaliatory conduct in response to exercising a constitutional right consists of three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary

---

[18] The pages of Defendants' Memorandum in support of the Motion for Summary Judgment are not numbered. The Court has performed this task and cites accordingly. However, counsel's attention is directed to District of Rhode Island Local Rule ("DRI LR") Cv 5(a), which provides, in relevant part:

(3) Format; Page Numbering. Unless otherwise provided or ordered by the Court, all documents shall be double-spaced and typed in at least 12-point font. Footnotes shall be in at least 10-point font and may be single-spaced. **Where a document is more than one page in length, the pages shall be numbered at the bottom center of each page.**

DRI LR Cv 5(a)(3) (bold added).

firmness from continuing to engage in that conduct; and (3) there is a causal connection between the constitutionally protected conduct and the adverse action, i.e., the adverse action was motivated at least in part by the plaintiff's protected conduct. Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999); Price v. Wall, 464 F.Supp.2d 90, 96 (D.R.I. 2006); see also McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979)(holding that prisoner who alleges that he was transferred in retaliation for exercising his constitutional right to petition the courts has "properly stated a cause of action").

Here Plaintiff alleges that he filed a § 1983 lawsuit on July 24, 2007, see Complaint at 10; that two days later Melino and four other correctional officers came to his cell to search it, see id.; that they berated him for filing the lawsuit and told him that it had been "opened, read & trashed," id. at 10-11; that Melino pulled a twelve inch piece of steel from his waistband and falsely claimed to have found it in Plaintiff's cell vent, id. at 11; and that as a result Plaintiff was "booked" for possessing a weapon and placed in segregation, id. Because Plaintiff has a constitutional right to petition the courts, McDonald v. Hall, 610 F.2d at 18, and he has alleged that he suffered an adverse action for attempting to exercise that right, namely being falsely charged with possessing a weapon and placed in segregation as a result, and a causal relationship can be reasonably inferred between his exercise of the

constitutional right and the adverse action, Plaintiff has a viable retaliation claim. The casual relationship is reasonably inferred based on Plaintiff's claim that the officers berated him for filing the lawsuit and the temporal proximity of the filing of the lawsuit and the adverse action.

Defendants appear to dispute that Plaintiff filed a lawsuit on July 24, 2007. See Memorandum at 4. They note that the docket reflects that the Complaint in this action was filed on November 1, 2007, and they represent that they "are unaware of any other complaint filed by the plaintiff in this Honorable Court or in the State Courts." Memorandum at 4. However, Plaintiff's Complaint is reasonably understood to mean that he "filed" the lawsuit by placing it in the prison mail system. See Casanova v. Dubois, 304 F.3d 75, 79 (1st Cir. 2002)(holding "that the mailbox rule ... govern[s] the determination of when a prisoner's § 1983 filing has been completed"); see also Douglas v. Noelle, 567 F.3d 1103, 1107 (9th Cir. 2009)("All of the rationales articulated by the Supreme Court in Houston [v. Lack, 487 U.S. 266, 108 S.Ct. 2379 (1988)] for applying the mailbox rule to prisoners' notices of appeal apply equally, if not more strongly, to § 1983 complaints."); cf. Morales-Rivera v. United States, 184 F.3d 109, 110 (1st Cir. 1999) ("pro se prisoners have no choice but to rely for filing upon prison and postal authorities over whom they exercise no control"). Plaintiff alleges that his complaint was "opened, read & trashed."

25

Complaint at 11. In light of this contention, there would be no court record of Plaintiff filing a lawsuit on July 24, 2007, because the correctional officers allegedly trashed his complaint.

In sum, while Defendants are correct that the only evidence proffered by Plaintiff in support of his retaliation claim is his own testimony that Melino planted the weapon in his cell, such evidence is enough to require denial of Melino's request for summary judgment. The fact that "Defendants directly contradict said testimony ...," Memorandum at 4, is not sufficient to entitle Melino to summary judgment. Defendants' arguments to the contrary should be rejected, and I so recommend.

## VI. Conclusion

For the reasons stated above, I recommend that Defendants' Motion for Summary Judgment be denied. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
December 7, 2011